******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* ERICK BENNETT
### (SC 18862)

Rogers, C. J., and Palmer, McDonald, Espinosa and Robinson, Js.

*Argued November 8, 2016—officially released March 14, 2017*

*Erick Bennett*, self-represented, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, former state's attorney, and *Elizabeth Baran*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Erick Bennett, directly appeals to this court following his conviction of murder in violation of General Statutes (Rev. to 2009) § 53a-54a. The defendant claims that there were numerous defects in his trial, the principal of which was that the trial court violated his constitutional right to present a defense by improperly refusing either to issue a summons to secure the attendance of a material witness in support of a theory of third-party culpability, or to allow the defendant to introduce that witness' statement to the police in lieu of her live testimony.[1] We conclude that defense counsel's failure to locate the out-of-state witness with any reasonable degree of certainty precludes relief regarding the issuance of a summons for the witness and that none of the defendant's remaining claims warrant reversal of the trial court's judgment of conviction.

The jury reasonably could have found the following facts. On the evening of July 10, 2009, the victim, Willie Brown, and his girlfriend, Veronica Arroyo, attended a social gathering. Around 9 p.m., the defendant and his sister, who were casual friends with Arroyo, picked up Arroyo to go to Raffy's Café Bar in Meriden.

Upon arriving outside the bar, Arroyo saw Christopher Benjamin, a close friend of Brown's, and greeted him. Brown called Arroyo on her cell phone, and after she told him that Benjamin was at the bar, Brown prevailed upon Benjamin to pick him up and bring him there despite Arroyo's plea to Benjamin that he not do so because she was concerned that Brown had been drinking and would get into trouble.

After Brown arrived, he and Arroyo began to argue while they and others stood in the parking lot behind the bar. When they first started to argue, the defendant came over and told Brown to "chill out," which made Brown angry. Benjamin stepped in between the two men and the situation deescalated, but not before Benjamin saw the defendant holding a pocketknife at his side. After Arroyo and Brown recommenced arguing, Benjamin walked over to the couple. Arroyo then began hitting and cursing at Benjamin for bringing Brown to the bar. Brown pried Arroyo away from Benjamin, but then began arguing with Arroyo again in the vicinity of the defendant. Benjamin heard the defendant state: "I'm not here for this . . . . I don't give a fuck. I'm going [to] kill him. I don't care." The defendant then held a knife up to Benjamin's neck, threatening: "[I]f I really wanted to kill you, I can right now." Benjamin walked away, and Arroyo and Brown momentarily stopped arguing.

After a third argument commenced between Arroyo and Brown, the defendant and Brown exchanged words. The two men came face-to-face, and the defendant

pushed Brown to the ground. When Brown stood up, the defendant stabbed him in the chest several times, inflicting mortal wounds. Brown initially was able to get to his feet, but stumbled around and then collapsed to the ground. Benjamin heard a woman screaming and ran over to Brown, becoming hysterical when he saw how badly Brown was injured.

The defendant and his sister fled the scene in his vehicle. He spent the night at his sister's home and left for New York City the following day, returning to Meriden several weeks later.

The police obtained evidence inculpating the defendant shortly after the crime. Arroyo and Benjamin gave statements identifying the defendant as the person who had stabbed Brown. Another witness to the incident, Brandon Hogue, described the person who stabbed Brown as a man in a red or purple polo shirt, which was consistent with the clothing worn by the defendant that night. Although the police did not recover the entire knife, they found two thumb studs—the part of a folding knife used to open the blade—in the defendant's vehicle with blood on them that was consistent with Brown's DNA profile.

The defendant testified at trial. He denied stabbing Brown and claimed not to know who had done so because he had been walking to his vehicle when the stabbing occurred. The defendant suggested through the testimony of the mother of several of his children that the police had planted the knife thumb studs in his vehicle.

The defendant attempted unsuccessfully to obtain and introduce certain evidence in support of a theory that Benjamin or some unidentified Spanish speaking man or men had stabbed Brown, as well as evidence of police bias against him. Following the jury's verdict of guilty on the murder charge, the defendant also unsuccessfully sought permission to file a late motion for a new trial on the basis of a newly published report finding certain defective procedures in the state forensic laboratory. Those rulings, as well as challenges to the propriety of certain statements made by the prosecutor during cross-examination and closing arguments, are the subject of the present appeal.

I

The defendant's principal claim is that he was deprived of his constitutional rights to present a defense and to compulsory process insofar as he was unable to offer testimony from Jennifer Matias, a witness in support of his defense of third-party culpability, or Matias' statement she made to the police. Specifically, the defendant contends that the trial court improperly (1) denied his request for a material witness warrant to obtain Matias' appearance from out of state, and (2) denied admission of a recorded statement that Matias

had given to the police. We disagree.

The record reveals the following additional undisputed facts. Matias made a 911 call to the police regarding the incident at Raffy's Café Bar. When the police arrived thereafter, she gave them a statement about what had prompted the call. She went to the police station approximately one hour later and gave a second statement, which was recorded. In her recorded statement, Matias provided the following account. Matias was visiting her mother's apartment, located across the street from the bar, when she heard people yelling. She went to the window and observed approximately twenty people standing around behind the bar watching a fistfight. Matias could not make out any features of the people fighting because the only light was from the bar, but she could see that there were three black men involved in the fight: a man in a red shirt, a man in a yellow shirt, and a man in a white shirt. Those descriptions matched the clothing worn that night by the defendant (red shirt), Benjamin (yellow shirt), and Brown (white shirt). Matias heard one or more women yelling, "Don't do it. . . . Gun. Oh, my God. A gun." After seeing the man in the yellow shirt push the man in the white shirt to the ground, Matias left the window to call 911. She then heard one or more gunshots, which brought her back to the window. She observed the man in the red shirt flee and drive away, while the man in the yellow shirt knelt next to the man in the white shirt on the ground. The man in the yellow shirt was hysterical, and stated, " 'Oh, I killed him. I killed him.' "

Defense counsel first alerted the trial court to concerns about his ability to proffer Matias as a witness as jury selection was about to commence. He explained that Matias had called him after she learned that he had mailed a subpoena to her residence, and had stated "that she had been contacted by several people over the past few months and she did not want to take any part in this case. She was told by a woman by the name of "Beth"—the name of the prosecutor—"that she did not have to do so if she didn't want to. Also . . . she [stated] that . . . [t]he Meriden Police Department indicated that if anybody had called her or had spoken to her about this case that they would take care of it." Matias hung up without telling defense counsel where she was. Defense counsel stated his intent to file a motion on this matter.

Shortly thereafter, the defendant filed a motion in limine seeking to admit the recorded interview that Matias had given to the police. The defendant argued therein that, because the police had failed to preserve Matias' 911 call,[2] he should be permitted to introduce the only recording preserving her version of the incident—i.e., the interview. In his memorandum in support of the motion, dated May 31, 2011, defense counsel noted that Matias had informed him that she would not

be returning to Meriden until June 6, 2011.

On June 9, 2011, the trial court informed counsel that it was deferring a ruling on the motion in limine, noting that defense counsel was still seeking to serve a subpoena on Matias. Defense counsel then requested that the court "consider giving an order that the state issue a material witness warrant" for Matias. He noted that he had attempted to serve Matias with a subpoena at her residence and at her mother's residence, but was unsuccessful because she was not in Connecticut. He added that, without personally serving Matias, "[t]he only other remedy at the defense's disposal would be to ask the court for a material witness warrant which falls pursuant to, I believe, it's [General Statutes §] 54-84j[3] and the state has the ability to ask for [one]. I do not have that ability. So, I would request that the court order the state to issue a material witness warrant for . . . Matias." (Footnote added.) The trial court declined to rule on that request, noting that defense counsel had indicated in his motion in limine that Matias would be returning to Meriden on June 6, 2011, and that he still had time to serve her with a subpoena, but suggesting that counsel could renew his request if his efforts were unsuccessful.

During the state's case-in-chief, defense counsel brought to the court's attention that he had received information from Matias and another person that Matias was then in Puerto Rico and did not anticipate returning to the state. Several days later, defense counsel renewed his request for the court to order the state to issue a material witness warrant for Matias. The trial court then asked: "[T]hat is pursuant to [General Statutes §] 54-82j. Is that correct, counsel?" Defense counsel answered, "That's correct, Your Honor." In response to questioning from the court, defense counsel conceded that he knew of no case in which a court had ordered the detention of a witness for a defendant pursuant to § 54-82j, but claimed that fundamental fairness required that he should have access to the same discovery tool available to the state. The trial court read the text of § 54-82j on the record and then denied counsel's request on the following ground: "We don't have an address for [Matias]. There's no case law that this court is aware of and the statute is clear on its face that it is a written complaint from the state's attorney addressed to the clerk. So this court does not have authority pursuant to the statute to grant the request of defense counsel . . . ."

Shortly before the close of the state's case-in-chief, the court heard argument on the defendant's motion in limine seeking admission of Matias' recorded statement to the police. Defense counsel argued that the defendant's right to present a defense would be violated unless the trial court admitted Matias' statement inculpating Benjamin—the only evidence of her version of

events because of the state's failure to preserve the 911 call and its fault in encouraging Matias' absence at trial. Defense counsel asserted that the statement was admissible under the residual hearsay exception. In response, the prosecutor explained that she had not told Matias that she did not have to appear at trial, but instead had only told her she did not have to speak with anyone who was harassing her about the case. The prosecutor argued that the statement was inadmissible under the residual hearsay exception and contained many layers of hearsay. After the prosecutor also suggested that Matias should not be deemed unavailable because defense counsel could have taken greater efforts to travel out of state to serve her, counsel responded that he "ha[d] no address for this witness in Puerto Rico" and that she was unwilling to provide such information.

The trial court denied the defendant's motion on the ground that the statement did not satisfy the residual hearsay exception. The court put aside the issue of reasonable necessity, resting its ruling on the ground that her statement was not sufficiently trustworthy. The court reasoned that Matias had not appeared at a probable cause hearing and, thus, her account had never been subjected to cross-examination. The court also noted that Matias' statement was not corroborated by the testimony of any of the other three eyewitnesses.

A

We begin with the defendant's claim that he was deprived of his right to present a defense insofar as the trial court declined to issue a material witness warrant to obtain Matias' appearance. On appeal, the defendant concedes that the proper statute for a defendant to invoke to seek the court's issuance of a certificate for procuring out-of-state witnesses is General Statutes § 54-82i,[4] and that § 54-82j, which was invoked before the trial court, addresses the state's right to have a warrant issued on its behalf by the clerk of the court. The defendant nevertheless contends that he preserved his claim under § 54-82i because his request was sufficiently clear to invoke the procedures of that statute, a proposition that the state vigorously disputes. The defendant alternatively seeks to prevail on an unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. We conclude that the defendant's inability to provide a location for Matias with any reasonable degree of certainty is fatal to his claim that his right to present a defense was violated by the court's failure to issue a certificate to summon her from out of state.

At the outset, we note that, contrary to the defendant's contention, he did not make a generalized request for the *trial court* to issue a material witness warrant. Rather, defense counsel repeatedly affirmed in response to unambiguous questions from the court that he was asking the court to order *the state* to seek the

issuance of a material witness warrant *under § 54-82j*. Although this court has recognized that it can be plain error for a trial court to fail to apply a clearly applicable statute, even if the parties do not bring it to the court's attention; see *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993); the situation here is a step removed from that case law. In the present case, the defendant repeatedly invoked the wrong statute and asked the court to take a different action (ordering action by the state), but to achieve an end that a different statute plainly authorized—the court's issuance of a certificate summoning the out-of-state witness. We conclude that, irrespective of whether we assume that our clear error case law extends to such circumstances and that the trial court had adequate notice of the defendant's claim to render it preserved for appellate review, his claim fails.

We agree with the defendant that the record is adequate for review. Although the state correctly points out that the trial court never made a predicate factual finding that Matias would be a "material" witness, no reasonable trier of fact could conclude otherwise. For the reasons that follow, we further agree with the defendant that the improper denial of the use of the procedures set forth in § 54-82i for procuring out-of-state material witnesses states a cognizable constitutional claim.

The sixth amendment to the United States constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." The sixth amendment right to secure the compulsory attendance of witnesses on one's behalf and the more general right to present a defense is applicable to the states through the due process clause of the fourteenth amendment. *Washington* v. *Texas*, 388 U.S. 14, 17–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

It is well settled, however, that a state court's subpoena power is limited to the state's borders. See *Minder* v. *Georgia*, 183 U.S. 559, 562, 22 S. Ct. 224, 46 L. Ed. 328 (1902) ("it is not within the power of the Georgia courts to compel the attendance of witnesses who are beyond the limits of the [s]tate"). For this reason, several state courts have recognized that the sixth amendment right to compulsory process does not give a defendant the right to compel the attendance of witnesses from beyond the court's jurisdiction. See *People* v. *Cavanaugh*, 69 Cal. 2d 262, 265, 444 P.2d 110, 70 Cal. Rptr. 438 (1968), cert. denied, 395 U.S. 981, 89 S. Ct. 2139, 23 L. Ed. 2d 768 (1969); *Commonwealth* v. *Edgerly*, 6 Mass. App. 241, 255 and n.6, 375 N.E.2d 1 (1978); *State* v. *Closterman*, 687 S.W.2d 613, 620 (Mo. App. 1985); *State* v. *Smith*, 87 N.J. Super. 98, 102, 208 A.2d 171 (1965); *People* v. *McCartney*, 38 N.Y.2d 618, 621, 345 N.E.2d 326, 381 N.Y.S.2d 855 (1976); *State* v.

*Blount*, 200 Or. 35, 50, 264 P.2d 419 (1953), cert. denied, 347 U.S. 962, 74 S. Ct. 711, 98 L. Ed. 1105 (1954). It was to fill in this gap that the 1936 Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings was adopted in all fifty states, as well as the Virgin Islands and the District of Columbia. Unif. Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, 11 U.L.A. 1–2 (West 2003) (table of jurisdictions wherein 1936 uniform act has been adopted); see also footnote 4 of this opinion (Puerto Rico has adopted similar reciprocal statute). Nevertheless, "[n]either the requirements of compulsory process nor of the [f]ourteenth [a]mendment . . . demand that [a] state enact such legislation. . . . The operation of the [u]niform [a]ct depends upon the principles of comity, and it has no efficacy except through the adoption of the same act by another state." (Citation omitted.) *State* v. *Blount*, supra, 50; accord *People* v. *Cavanaugh*, supra, 266 n.3.

Other courts have recognized, properly in our view, that when a defendant has the right to secure the attendance of out-of-state witnesses through the uniform act, the improper denial of the use of such procedures can result in a violation of the defendant's constitutional rights to due process and to present a defense. See *Preston* v. *Blackledge*, 332 F. Supp. 681, 684 (E.D.N.C. 1971); *State* v. *Brady*, 122 Ariz. 228, 230, 594 P.2d 94 (1979); *Rivera* v. *District Court of Comanche County*, 851 P.2d 524, 527 (Okla. 1993). Accordingly, we agree with the defendant that, if he were improperly denied the procedures in § 54-82i for compelling the attendance of a material out-of-state witness, his constitutional rights under the sixth and fourteenth amendments were violated. Nonetheless, the defendant cannot establish that the trial court improperly failed to grant his request to summon Matias from out of state under § 54-82i.

Although we have not previously addressed this question, other jurisdictions have considered the defendant's ability to locate the witness in assessing whether the trial court abused its discretion in refusing to issue process for an out-of-state witness. In the seminal case on this issue, *Lancaster* v. *Green*, 175 Ohio St. 203, 205, 192 N.E.2d 776 (1963), the court observed: "Inasmuch as a state's process cannot extend beyond its borders, and, thus, the state cannot as a matter of right compel the attendance of a witness beyond its borders but can only procure such witnesses by the voluntary cooperation of another state, clearly the accused must be able to designate the witness and his location with exactitude before any duty devolves on the court to initiate the complex judicial process necessary under these acts to procure the attendance of out-of-state witnesses." Other jurisdictions have followed suit, requiring the defendant to adequately designate the witness' location. See, e.g., *People* v. *Williams*, 114 Mich. App. 186, 201, 318 N.W.2d 671 (1982); *State* v. *Smith*,

supra, 87 N.J. Super. 105; *State* v. *Tindall*, 294 N.C. 689, 700, 242 S.E.2d 806 (1978).

When setting forth its reasons for denying the defense request in the present case, the trial court first stated that there was no address available for Matias. The defendant previously had conceded to the court not only that he lacked this information, but also that Matias was unwilling to provide it. The only information known to the defendant was that Matias was in Puerto Rico. We do not intend to suggest that the defendant necessarily was required to provide a residential street address. The defendant, however, should have indicated to the trial court that he had, or had some means by which he would be able to obtain, information to ascertain Matias' location with a reasonable degree of specificity that would allow service of the summons. He did not so do. Cf. *State* v. *Smith*, supra, 87 N.J. Super. 105 ("general reference to 'Royer Run, Pennsylvania,' without any designation of where the witness might be found therein, was not enough"); *State* v. *Green*, Docket No. 1997CA00382, 1998 WL 347092, *4 (Ohio App. June 22, 1998) (defendant failed to satisfy burden when deputy could not locate witnesses at address given and defendant was unable to offer additional information regarding their location). Nor did the defendant make any representation to this court that he would have been able to locate Matias had the certificate been issued. Accordingly, the defendant cannot establish that the trial court improperly failed to issue a certificate summoning Matias.

B

The defendant alternatively claims that the trial court infringed on his right to present a defense by improperly denying admission of Matias' recorded statement. The defendant contends that the trial court should have admitted the statement: (1) as a spontaneous utterance because Matias provided the statement approximately one hour after her 911 call; or (2) under the residual hearsay exception because it bore the requisite indicia of reliability and trustworthiness insofar as she was a neutral, disinterested witness. We conclude that the trial court did not abuse its discretion in declining to admit this statement.

A defendant has a constitutional right to present a defense, but he "is [nonetheless] bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 275, 96 A.3d 1199 (2014). Accordingly, "[i]f the proffered evidence is not relevant [or constitutes inadmissible hearsay], the defendant's right to confrontation is not affected, and the evidence was

properly excluded." (Internal quotation marks omitted.) *State* v. *Devalda*, 306 Conn. 494, 516, 50 A.3d 882 (2012); see also *State* v. *Hedge*, 297 Conn. 621, 634–36, 1 A.3d 1051 (2010) (defendant has constitutional right to introduce evidence of third-party culpability if it is relevant and directly connects third party to crime); *State* v. *Tutson*, 278 Conn. 715, 746–51, 899 A.2d 598 (2006) (no violation of constitutional right to present defense when trial court properly excluded evidence on hearsay grounds).

We can quickly dispose of the defendant's first evidentiary basis for admitting the statement. We agree with the state that the defendant's argument that Matias' recorded statement should have been admitted as a spontaneous utterance is not entitled to review because he did not seek admission of that statement on that basis. Rather, he sought admission of Matias' *earlier* statement to the police at the scene under that hearsay exception. The defendant does not challenge the exclusion of Matias' earlier statement or claim that he is entitled to review of an unpreserved evidentiary claim as to her later recorded statement. "Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Citation omitted; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003). Accordingly, the defendant is not entitled to review of his claim that Matias' recorded statement should have been admitted as a spontaneous utterance.

The defendant, however, is entitled to review of his claim that the trial court improperly precluded admission of the statement under the residual hearsay exception, the ground on which he did seek its admission. We review that decision for an abuse of discretion, making every reasonable presumption in favor of upholding the trial court's ruling. See *State* v. *Andrews*, supra, 313 Conn. 276; see also *State* v. *Myers*, 126 Conn. App. 239, 247, 11 A.3d 1100 ("[a] court's conclusion as to whether certain hearsay statements bear the requisite indicia of trustworthiness and reliability necessary for admission under the residual exception to the hearsay rule is reviewed for an abuse of discretion" [internal quotation marks omitted]), cert. denied, 300 Conn. 923, 14 A.3d 1006 (2011).

The legal principles guiding the exercise of the trial court's discretion regarding the admission of hearsay evidence under the residual exception are well established. "An [out-of-court] statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . As a general rule, hearsay evidence is not admissible unless it falls under one of several well estab-

lished exceptions. . . . The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination. . . . The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992); accord Conn. Code Evid. § 8-9. We have recognized that "[t]he residual hearsay exceptions [should be] applied in the rarest of cases . . . ." (Internal quotation marks omitted.) *State* v. *McClendon*, 248 Conn. 572, 585, 730 A.2d 1107 (1999), overruled in part on other grounds by *State* v. *Guilbert*, 306 Conn. 218, 246–53, 49 A.3d 705 (2012).

The trial court rested its decision solely on the ground that Matias' statement lacked sufficient reliability and trustworthiness. One factor supporting that conclusion was that Matias had never been subjected to cross-examination regarding the circumstances surrounding her observations of the incident. A declarant's availability for cross-examination has been deemed particularly significant in determining whether hearsay evidence is supported by guarantees of trustworthiness and reliability. Compare *State* v. *Sharpe*, 195 Conn. 651, 665, 491 A.2d 345 (1985) (concluding that residual hearsay exception satisfied when, among other reasons, declarant was available for cross-examination), with *State* v. *McClendon*, supra, 248 Conn. 583–84 (concluding that exception was not satisfied when, among other reasons, declarant was not available for cross-examination), *State* v. *Oquendo*, supra, 223 Conn. 668 (same), and *State* v. *Outlaw*, 216 Conn. 492, 499, 582 A.2d 751 (1990) (same). Matias conceded in her statement that the lighting was too limited to make out any distinguishing features of the people at the scene. Matias was never subject to cross-examination to further explore her ability to properly observe the events that she reported or her ability to accurately hear the sounds and statements that she had reported (i.e., how far she was from the incident, whether she has any visual or hearing impairments, whether there were obstructions or distractions at the time). Cf. *State* v. *Sharpe*, supra, 665 (citing, in addition to facts demonstrating that declarant was disinterested witness with no reason to make false statement to police regarding license plate number of strange car observed at victim neighbor's house, that declarant "was a witness at the trial and available for cross-examination as to his ability to perceive the license plate and whether he wrote the number down and related it accurately to [the police]").

Additionally, the evidence at trial not only failed to materially corroborate Matias' statement, it contradicted her statement in part. See, e.g., *State* v. *McClendon*, supra, 248 Conn. 584 (report unreliable for these reasons); *State* v. *Heredia*, 139 Conn. App. 319, 331, 55 A.3d 598 (2012) (offered testimony properly deemed unreliable when it "constituted hearsay within hearsay and was corroborated only by other hearsay statements rather than established facts"), cert. denied, 307 Conn. 952, 58 A.3d 975 (2013). None of the witnesses reported hearing any gunshots, and Brown's injuries were inflicted by a knife. Matias' report that a man in a yellow shirt was kneeling beside the victim stating, "Oh, I killed him. I killed him," was consistent with the other witnesses only insofar as they reported that Benjamin wore a yellow shirt as he knelt by Brown; no one reported that anyone had made statements remotely consistent with that statement or any others recounted by Matias. Given that Matias' report of this inculpatory statement constituted hearsay within hearsay, the lack of corroboration bore significantly on its indicia of reliability. See *State* v. *Heredia*, supra, 331.

Accordingly, the trial court did not abuse its discretion in concluding that Matias' statement was not imbued with guarantees of reliability and trustworthiness sufficient to support its admission under the residual exception. Because the trial court's evidentiary ruling was not improper, the defendant's claim of an infringement on his constitutional right to present a defense on this basis must fail. See *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010) ("[i]f . . . we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail").

## II

The defendant next claims that the trial court infringed on his right to present a defense when it denied the admission of a statement made by Arroyo to defense counsel's investigator, offered as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendant asserts that the trial court improperly concluded that the statement to the investigator was (1) unreliable because it had been given to a person other than a police officer fourteen months after the murder occurred, and (2) not sufficiently inconsistent with Arroyo's testimony and her statement to the police. The state concedes that it was improper for the trial court to deny admission of Arroyo's statement to the investigator as unreliable, but asserts that it was proper to exclude it on the ground that it was not sufficiently inconsistent with her testimony. We agree with the state that the statement to the investigator was not sufficiently inconsistent to satisfy *Whelan*.

The record reveals the following additional undisputed facts and procedural history. On the afternoon following the murder, Arroyo voluntarily came to the Meriden Police Department to be interviewed. Arroyo offered the following account in that interview, which was videotaped. Arroyo stated: "I walked in the bar with the guy . . . who did the stabbing; I was with him and his sister." She indicated that the defendant ended up arguing with Brown because Brown was telling Arroyo to stop hitting Benjamin, which prompted the defendant to urge Brown to "be cool." A crowd started to form and "five guys" surrounded the defendant, but they "backed away . . . [with] enough distance [such] that it was just [Brown], [Arroyo], and [the defendant]." Once Brown and the defendant started arguing face-to-face, Arroyo intervened, the defendant shoved her, and she fell to the ground. Although she saw no weapons, Arroyo said that the defendant was the closest person to Brown when he began stumbling. As she observed Brown collapse on the ground, Arroyo saw the defendant get into his car with his sister. She ran up to the car and asked the defendant, "What the hell did you do?"

Despite Arroyo's subsequent reluctance to cooperate with the state, the state called her as a witness during its case-in-chief. In her trial testimony, Arroyo offered an account of the incident that departed substantively from her statement to the police. On direct examination, she testified that after her physical confrontation with Benjamin, she saw Brown surrounded by and arguing with several men. Arroyo testified that she then pushed Brown behind her, "telling the other guy to back up and don't even dare, because I don't know who the other guy was coming behind him." Once the crowd began to "move away," she saw Brown stumbling toward a car and then suddenly fall to his knees. She denied seeing Brown and the defendant engaged in any arguments or altercations, although she acknowledged that she got in between the two "to try to break things up." She also indicated that the defendant was not near Brown when he began stumbling, asserting that the defendant was already making his way to his car. Arroyo did not recall approaching the defendant after Brown fell to the ground.

The state confronted Arroyo with inconsistencies between her testimony and the recorded statement she had given to the police the day after the murder. Arroyo admitted that she remembered going to the police station, but claimed that she had no recollection of what she had told the police officers because she had been intoxicated. She also testified that she had identified the defendant as the person who committed the murder because that was what she had "heard around the streets" and who the detectives were saying committed the murder. The state was then permitted, without

objection, to introduce Arroyo's statement to the police as a prior inconsistent statement under *Whelan*.

On cross-examination, Arroyo gave an account of the incident that tended to inculpate Benjamin or other unidentified third parties. Arroyo testified that Benjamin was outside the bar with a man wearing a red T-shirt when she arrived. Benjamin made "romantic passes" at Arroyo before he knew that Brown would be joining them. She saw Benjamin holding a "carrier knife." After Brown arrived, he "had a problem" with "[t]he guy at the juke box" who was wearing a red polo shirt. When Arroyo confronted Benjamin about bringing Brown to the bar, she overheard a "Spanish guy saying stuff in Spanish and people just arguing . . . ." Arroyo then observed Brown arguing with four or five men, none of whom was the defendant. During the argument, Brown fell to the ground, got back up, and then started hyperventilating and "making fists." When another argument ensued, the defendant walked Arroyo away from the fight and stated that he was leaving. Turning back to the crowd, Arroyo saw Brown stumble and fall to the ground. Although Arroyo did not see who stabbed Brown, she denied that the defendant did it. She further testified that when Brown was bleeding out, she asked Benjamin for help but he walked away.

On redirect, the state asked Arroyo why she had never told the police about "this alleged Spanish man" or "group of guys" with whom Brown was arguing. She testified that she was not lying when she told the police that the defendant was the person Brown stumbled away from because that was what she thought at the time. Arroyo stated that she realized one year later that the defendant did not stab Brown and that he was not the only person wearing a red shirt on the night of the murder.

Thereafter, the defendant sought to admit a portion[5] of the statement Arroyo gave to the investigator fourteen months after the homicide as a prior inconsistent statement under *Whelan*. The signed transcript of the relevant excerpt of that statement provides: "[Brown] was a little bit out of control because he even, like pushed me away to the ground because I seen another guy coming like behind him. So I grabbed him and pushed him toward me and told the guy don't even get involved. I didn't know who he was, I don't remember who he is, I know he was like Spanish looking but he could've just been a light skinned—he was light skinned. By this time everything was really crazy, I know I fell to the ground like twice. While down on the ground I don't know what happened, I know I remember seeing [Benjamin] screaming and, um, I remember [Brown] half fell to the ground. And when [Brown] was on the ground I seen [Benjamin] over him, I don't know what he was doing but after that Brown still got up and on my left I can see [the defendant] and his sister

walking toward the car to leave, he was like, 'I'm out of here, I don't want to deal with this mess.' So he left. I was there now alone. I see [Brown] walking toward me . . . and he just . . . fell. He just fell to the floor . . . ." Following the state's objection, the court ruled, inter alia, that the statement to the investigator was not sufficiently inconsistent with Arroyo's testimony to satisfy *Whelan*.

The following principles guide our analysis of the defendant's claims. "In *State* v. *Whelan*, supra, 200 Conn. 753 . . . we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 641–42, 945 A.2d 449 (2008).

"The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); see also *State* v. *Bruno*, 236 Conn. 514, 554, 673 A.2d 1117 (1996) (whether prior statement is in fact inconsistent is matter to be determined within trial court's discretion); *State* v. *Whelan*, supra, 200 Conn. 748 n.4 (same).

"In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made." (Citations omitted; internal quotation marks omitted.) *State* v. *Whelan*, supra, 200 Conn. 748–49 n.4. "Inconsistencies may be shown not only by contradictory statements, but also by omissions." Id., 748 n.4; see also *Falls* v. *Loew's Theatres, Inc.*, 46 Conn. App. 610, 615, 700 A.2d 76 (1997). Finally, "the inconsistency must be substantial and relate to a material matter." *State* v. *Piskorski*, 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979), superseded by statute on other grounds as stated in *State* v. *Canady*, 187 Conn. 281, 283–84, 445 A.2d 895 (1982); accord *State* v. *Christian*, 267 Conn. 710, 756, 841 A.2d 1158 (2004), superseded by

statute on other grounds as stated in *State* v. *Davalloo*, 320 Conn. 123, 140, 128 A.3d 492 (2016).

Insofar as the defendant claims that the relevant comparison is between Arroyo's statement to the investigator and her statement to the police, he has cited no legal authority for the proposition that *Whelan* permits the admission of a statement that is inconsistent with another statement made by the declarant that was admitted pursuant to *Whelan*. To the contrary, we have always analyzed whether the prior statement is inconsistent with the declarant's testimony at trial. See *State* v. *Whelan*, supra, 200 Conn. 748 n.4 ("[i]n determining whether an inconsistency exists, *the testimony of a witness* as a whole, or the whole impression or effect of what has been said, must be examined" [emphasis added]). Moreover, the defendant's proposed application of *Whelan* would subvert long-standing rules regarding the limited admissibility of prior consistent statements. If, for example, the declarant's proffered prior statement is inconsistent with another prior statement previously admitted but is largely consistent with the declarant's trial testimony, admitting the former pursuant to *Whelan* would, in effect, be admitting a prior consistent statement for substantive purposes. "As a general rule, a witness' prior consistent statements are inadmissible at trial. . . . Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 412, 692 A.2d 727 (1997); accord Conn. Code Evid. § 6-11 (a). Even when a prior consistent statement is admitted under an exception to the general rule, the statement is admitted to affect credibility only and not to establish its truth. *State* v. *Valentine*, supra, 413. Thus, the trial court properly limited its comparison to Arroyo's testimony at trial in determining if her statement to the investigator was sufficiently inconsistent to permit its admission pursuant to *Whelan*.

We consider in turn the inconsistencies identified by the defendant to the trial court as the basis for the admission of Arroyo's statement to the investigator. The defendant identified Brown's behavior as one such inconsistency. In her statement to the investigator, Arroyo described him as "a little bit out of control . . . ." In her trial testimony, Arroyo acknowledged that she had expressed a concern about Brown getting into trouble if he came to the bar because he had been drinking. Arroyo testified that after Brown arrived, he became upset with a man standing near the juke box and engaged in arguments with both Benjamin and a group of men. Finally, according to Arroyo, after Brown got up from the ground amid his argument with the group of men, he was hyperventilating and "making fists." Thus, we conclude that the statement to the investigator was not materially inconsistent with Arroyo's

testimony on this matter.

The defendant also identified Arroyo's description of the location of a "light skinned," "Spanish looking" man. In her statement to the investigator, Arroyo indicated that a man with those features came up behind Brown, at which point she "grabbed [Brown] and pushed him toward [her] and told the guy don't even get involved." At trial, Arroyo testified that she heard a "Spanish guy saying stuff in Spanish and people just arguing" right before she observed Brown arguing with four or five men. She further testified that she "remember[ed] pushing [Brown] behind [her] and telling the other guy to back up and don't even dare, because [she did not] know who the other guy was coming behind him." On redirect, she acknowledged that Brown had gotten into an argument with a Spanish man. Although there are a few nonmaterial distinctions, there is not a material inconsistency with regard to this aspect of her statement to the investigator.

The defendant also pointed to Arroyo's description of Benjamin's behavior at or near the time of the stabbing. In her statement to the investigator, Arroyo described Benjamin as "screaming" near Brown, Brown "half" falling to the ground, and Benjamin standing over Brown before Brown initially got up. Arroyo did not identify where Benjamin was after Brown got up. Arroyo did not testify to any of these facts at trial. Nevertheless, we do not agree that this omission alone required admission of the statement to the investigator. First, it is unclear what significance this portion of Arroyo's statement to the investigator has to determining whether the defendant or another person committed the murder. See *State* v. *Piskorski*, supra, 177 Conn. 710 ("inconsistency must be substantial and relate to a material matter"). It does not tend to establish that Benjamin had caused Brown to fall to the ground, or more importantly, that Benjamin was next to Brown when he was stabbed and fell the final time. Second, Arroyo's statement to the investigator was not inconsistent with her testimony that several people were standing next to Brown before he was stabbed. Although her testimony did not indicate who was there, she testified that the defendant was not one of them. Consequently, the overarching effect of her testimony and her statement to the investigator was the same—although she did not know who stabbed Brown, she was certain that the defendant was not in Brown's vicinity when it occurred and, therefore, could not have stabbed him.

Finally, to the extent defense counsel asserts that Arroyo's statement to the investigator "critically" noted that Benjamin was trying to hit on her prior to Brown's arrival at the bar, that portion of Arroyo's statement was not included in the proffer to the trial court. See footnote 5 of this opinion. In any event, because Arroyo testified that Benjamin was making "romantic passes"

at her, that part of her statement was not inconsistent with her testimony.

On the basis of the foregoing, we conclude that the trial court did not abuse its discretion in deeming Arroyo's statement to the investigator insufficiently inconsistent with her trial testimony to be admitted pursuant to *Whelan*. Accordingly, the defendant's claim that the failure to admit this statement violated his right to present a defense necessarily fails. See *State* v. *Davis*, supra, 298 Conn. 11.

### III

The defendant next claims that the trial court abused its discretion in failing to disclose the personnel files of several police officers who were involved in the murder investigation and who testified at trial. Specifically, the defendant contends that the trial court abused its discretion in concluding, after reviewing the confidential records in camera, that no information contained therein was probative of those officers' ability to know and correctly relate the truth. Our review of the record reveals, however, that the defendant misconstrues the basis of the trial court's decision. The trial court concluded that an in camera review was not warranted because the defendant had failed to make the requisite preliminary showing that the records would shed some light on the officers' ability to testify truthfully. The defendant has not challenged the trial court's conclusion that he failed to meet this preliminary burden for in camera review. Accordingly, the defendant is not entitled to review of this claim.

### IV

The defendant also claims that the trial court improperly limited his cross-examination of Officer Constantina Benzi of the Meriden Police Department concerning the defendant's past interactions with that police department that may have biased Benzi or other police witnesses against the defendant. We disagree.

At trial, Benzi testified that on the morning after the murder, Arroyo entered the Meriden police station while Benzi was working at the front desk. She further testified that Arroyo gave her a photograph and identified the person therein as the defendant's sister, which in turn prompted Benzi to put Arroyo in contact with one of the detectives working on the investigation. Benzi had no other involvement with the case, and Arroyo corroborated Benzi's testimony.

Prior to Benzi's cross-examination, defense counsel informed the court that he intended to question Benzi about a complaint, later deemed unsubstantiated, that the defendant had filed against Benzi three years before the murder regarding her response to a complaint of dog fighting in the defendant's yard that ultimately resulted in an injury to one of the dogs. The trial court allowed defense counsel to inquire on cross-examina-

tion whether Benzi was biased against the defendant, but denied counsel's request to inquire whether other police officers were aware of the complaint from news coverage, or otherwise, on the ground that those inquiries were not relevant to establish the bias of other officers.

We conclude that the trial court did not abuse its discretion in limiting cross-examination of Benzi. Neither the existence of the complaint nor its publication gave rise to a reasonable factual basis to inquire of Benzi whether a department wide bias against the defendant existed. See, e.g., *State* v. *Isabelle*, 107 Conn. App. 597, 607, 946 A.2d 266 (2008) (explaining proffering party's obligation to establish relevancy of impeachment evidence by laying proper foundation, and noting that "[n]one of the evidence in the defendant's proffer, or in the record as a whole, provided a factual basis to conclude that a [department wide] bias against the defendant had existed among the Bethel police, and the defendant failed to state a good faith belief that such bias had existed"). Moreover, the introduction of such testimony potentially would have confused the issues of the case, creating a trial within a trial on the collateral issue of the propriety of Benzi discharging her firearm during the incident. See id. ("[i]t is a reasonable exercise of judicial discretion to exclude . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case" [internal quotation marks omitted]).

V

The defendant next claims that the trial court improperly denied his request for an evidentiary hearing on his motion for permission to file a late motion for a new trial. We disagree.

On June 29, 2011, the jury returned its verdict. In August, 2011, the defendant filed a motion for permission to file a late motion for a new trial on the basis of a report issued by the National Institute of Justice and National Forensic Science Technology Center on July 13, 2011. That report was issued after an external audit was conducted of the state forensic science laboratory on July 11 through July 13, 2011, which concluded, among other findings, that the state laboratory was not using "validated methods for DNA analyses." The defendant argued that he properly sought relief via a motion for a new trial, not a petition for a new trial, because the results of the external audit constituted "recently disclosed," not newly discovered, evidence. Counsel then requested an evidentiary hearing on this matter, asserting that "[t]here's been several reports out there that information was disclosed to the state's [a]ttorney's office [and] the governor's office" before the verdict was returned. The trial court declined to order an evidentiary hearing, denying the motion on

the ground that the report of the audit results constituted newly discovered evidence that must be presented by way of a petition for a new trial pursuant to Practice Book § 42-55.

Initially, we reject the defendant's attempt to recast his claim on appeal as a violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). See id., 87 (requiring new trial if state fails to disclose material exculpatory evidence). The defendant neither raised a *Brady* claim in his motion for a new trial nor advanced it at oral argument on the motion. The defendant also has not briefed a *Brady* claim as an unpreserved issue under *Golding*. Accordingly, we review the trial court's denial of the defendant's request for an evidentiary hearing for an abuse of discretion. See *State* v. *Nguyen*, 253 Conn. 639, 653, 756 A.2d 833 (2000).

We discern no error in the trial court's conclusion that the defendant's purported offer of proof was insufficient to trigger the need for an evidentiary hearing. The defendant sought a new trial on the basis of the issuance of a report containing findings made from an audit, all of which occurred after the verdict was returned, not on the basis of the state's purported knowledge during trial that an external audit was going to be conducted. Indeed, nothing in the report indicates that the procedural defects identified therein were known or suspected at the time of trial. Accordingly, once the court properly concluded that the external audit results constituted newly discovered evidence, it lacked authority to consider the relief sought by the defendant in his motion pursuant to Practice Book § 42-53. See generally *State* v. *Gonzalez*, 106 Conn. App. 238, 261–62, 941 A.2d 989 (distinguishing procedures required to initiate petition for new trial from those for motion for new trial), cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

VI

Finally, we address the defendant's claim that prosecutorial improprieties in cross-examination and closing arguments deprived him of a fair trial. Having undergone a thorough review of the record in light of the parties' arguments, we conclude that only one of the defendant's claimed improprieties merits discussion. Specifically, the defendant contends that the prosecutor's closing argument improperly characterized defense counsel's strategy in a manner suggesting that he was attempting to mislead the jury. The state acknowledges that the comments identified are similar to ones that we deemed improper in *State* v. *Albino*, 312 Conn. 763, 776–78, 97 A.3d 478 (2014), but nevertheless argues that the circumstances are distinguishable. We agree with the state and take this opportunity to explain the distinction.

The record reveals the following additional facts.

Two police officers watched over the defendant's vehicle while a warrant was being procured to search it. The defendant elicited testimony from the mother of several of his children that she had observed those two police officers open the door and enter the vehicle before the warrant was issued. The defendant attempted to use this testimony to support his theory that the police officers had planted the knife thumb studs in his vehicle. In her rebuttal argument, the prosecutor described this evidence as "just another thing to throw at you [the jury] in a case where the evidence against the defendant is overwhelming." She added: "Do you notice those detectives that sat on the car were never asked about that when they were on the stand. Now, if there were really, really something you want to air out and get out in the open, wouldn't you vigorously go after them? Not if you don't want to hear the answer. You want to be able to boom, pop it on the jury and *see what sticks*." (Emphasis added.)

It is well settled that "the prosecutor, as a public official seeking impartial justice on behalf of the people of this state, has a heightened duty to avoid argument [or questioning] that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Albino*, supra, 312 Conn. 772. Nonetheless, "in evaluating claims of impropriety during summation, we recognize that the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . ." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 548, 122 A.3d 555 (2015). "Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 37, 100 A.3d 779 (2014).

In *Albino*, we concluded that the prosecutor improperly had characterized defense counsel's strategy in a manner to suggest that he employed tactics intended to mislead the jury by (1) analogizing the strategy to an octopus' defense mechanism of shooting ink into the water to attempt to muddy the waters, and (2) referring to the strategy as a " 'shotgun approach. You shoot it against the wall and you hope that something will stick.' " *State* v. *Albino*, supra, 312 Conn. 776–77. Notably, in deeming the argument improper, we focused principally on the first comment and noted its similarity in effect to language we deemed improper in *State* v. *Maguire*, 310 Conn. 535, 557, 78 A.3d 828 (2013), in which the prosecutor described the defense strategy as using "smoke and mirrors." *State* v. *Albino*, supra, 777–78. In *Maguire*, that phrase, like the improper octo-

pus analogy, "was compounded by, inter alia, statements that defense counsel . . . had attempted to sidetrack the jury through misdirection and by all of the stuff that he tried to throw against the wall during his closing remarks to the jury." (Internal quotation marks omitted.) Id., 778. We underscored that there is a distinction between improper argument that disparages the integrity or role of defense counsel and proper argument that disparages a theory of defense. See id., 776, citing *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). The comments we deemed improper in *Albino* and *Maguire* fell into the former category, constituting a broad disparagement of the defense strategy untethered to any specific facts or evidence.

Conversely, in the present case, the prosecutor's comment did not imply that defense counsel had employed some artifice to deceive the jury. Rather, the prosecutor's statements were directed at evidence that the defendant claimed lent support to his theory that the officers had planted the thumb studs. It was fair argument for the prosecutor to point out, albeit with rhetorical flourish, that defense counsel had declined to question the officers about their conduct because such questioning might have yielded testimony that contradicted his witness or otherwise undermined his theory.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant has asserted various claims under both the state and federal constitutions, but he has not provided an independent analysis of the former in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Therefore, we deem abandoned any state constitutional claims. See, e.g., *Barros* v. *Barros*, 309 Conn. 499, 507 n.9, 72 A.3d 367 (2013) ("we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue" [internal quotation marks omitted]).

[2] The parties stipulated that the failure to preserve the 911 call was due to the fact that the Meriden Police Department's telephone monitoring system had suffered "a complete shutdown" for several days, including the night of the murder, causing the loss of recordings for all incoming and outgoing calls.

[3] It is evident that the defendant meant General Statutes § 54-82j, not § 54-84j, a point that the trial court later clarified.

[4] General Statutes § 54-82i (c) provides in relevant part: "If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions . . . is a material witness in a prosecution pending in a court of record in this state . . . a judge of such court may issue a certificate under the seal of the court, stating such facts and specifying the number of days the witness will be required. Such certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure the attendance of the witness in this state. Such certificate shall be presented to a judge of a court of record in the judicial district in which the witness is found. . . ."

Puerto Rico has adopted a reciprocal statute allowing for the summoning of witnesses to testify in another state or territory in pending criminal prosecutions. See P.R. Laws Ann. tit. 34, § 1471 (2016).

General Statutes § 54-82j provides in relevant part: "Upon the written complaint of any state's attorney addressed to the clerk of the superior court for the judicial district wherein such state's attorney resides, alleging (1) that a person named therein is or will be a material witness in a criminal proceeding then pending before or returnable to the superior court for such

judicial district, and in which proceeding any person is or may be charged with an offense punishable by death or imprisonment for more than one year, and (2) that the state's attorney believes that such witness is likely to disappear from the state, secrete himself or otherwise avoid the service of subpoena upon him, or refuse or fail to appear and attend in and before such superior court as a witness, when desired, the clerk or any assistant clerk of the court shall issue a warrant addressed to any proper officer or indifferent person, for the arrest of the person named as a witness, and directing that such person be forthwith brought before any judge of the superior court for such judicial district, for examination. . . ."

[5] The defendant argues for the first time in his reply brief that the entire statement to the investigator was offered to contradict Arroyo's testimony regarding Benjamin's behavior. The record is clearly to the contrary. Defense counsel specifically requested "a portion" of that statement be admitted under *Whelan*, and identified the beginning and ending points of the portion of that statement that he sought to be admitted: "[T]he sixth line down, beginning [Brown] was a little bit out of control. I'm claiming down to the end of that answer in response where [she] says he just fell on the floor."

---