******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CHESTER J.*
(AC 41403)

Lavine, Moll and Sheldon, Js.**

*Syllabus*

The defendant, who had been convicted of various crimes in connection
with the sexual assault of the victim, appealed, claiming, inter alia, that
the trial court improperly denied his challenge to the jury panel, which
he claimed did not represent a fair cross section of the community in
violation of the sixth amendment and had been summoned under a
process that violated his right to equal protection. The defendant further
invited this court to exercise its supervisory authority to require the
collection and/or maintenance of venire panel demographic data. During
jury selection, the court conducted a hearing on the defendant's objec-
tion to the jury panel. Relying on census data, information from the
prospective jurors' questionnaires and the testimony of an expert witness
who used a Baysean probability model to predict the race of the prospec-
tive jurors, the defendant claimed that the state failed to engage in
substantive changes to remedy the underrepresentation of minorities
and overrepresentation of Caucasians in prospective jury pools and that
the state failed to adopt measures to increase minority participation in
jury pools. The questionnaires stated that prospective jurors had the
option of providing information as to their race but that they need
not do so if they found it objectionable. The defendant also provided
testimony from eight witnesses about how venire pools were selected
throughout the state and about the nonenforcement of civil penalties
on nonappearing jurors. None of the witnesses testified that they or the
state entities where they were employed compiled or maintained data
as to the racial or ethnic composition of venire panels in the state.
The defendant thus claimed that the Judicial Branch had seemingly
demonstrated wilful blindness in regard to the statutory (§ 51-232 (c))
requirement that it assure that venire panels are nondiscriminatory. He
also asserted that the state's failure to take action with jurors who did
not report for duty led to underrepresentation of certain groups. The
court ruled, inter alia, that the defendant had presented no evidence that
the purported underrepresentation of African-Americans and Hispanics
resulted from their systematic exclusion in the jury selection process,
or that the jury selection process was susceptible to abuse or racial
bias. *Held*:

1. The trial court did not err in denying the defendant's challenges to the
venire panels in violation of his constitutional rights:
a. The defendant did not establish a prima facie violation of the sixth
amendment right that the venire pool represent a fair cross section of
the community, as he failed to demonstrate that any underrepresentation
of African-Americans and Hispanics resulted from their systematic
exclusion in the jury selection process; although the state was generally
aware of a lower response rate to jury summonses from certain minority
groups, the uncontroverted evidence established that the process by
which the Judicial Branch's jury administration summons jurors is
accomplished without regard to race, and there was no evidence to
support a finding that enforcement of civil penalties against nonap-
pearing jurors would lead to greater responsiveness to juror summonses.
b. The court correctly rejected the defendant's equal protection claim,
as there was no evidence of a jury selection procedure that is susceptible
to abuse or is not racially neutral; the defendant did not establish that
the state systematically excluded African-Americans or Hispanics from
the jury selection process, and the defendant did not provide any evi-
dence of discriminatory intent with respect to excluding African-Ameri-
cans or Hispanics, rather, the evidence presented by the defendant
reflected that Judicial Branch officials were either unaware of the racial
and ethnic characteristics of people summoned for jury duty or that
such information was not retained or recorded.

2. This court declined to exercise its supervisory authority over the adminis-
tration of justice to require the state to collect demographic data in

accord with the directive of § 51-232 (c) to prevent discrimination in jury selection; the defendant's claims about the composition of jury panels at issue were unproven, and, as crafted by the legislature, the language of § 51-232 (c) explicitly makes the provision of racial and ethnic information discretionary rather than mandatory.

3. This court declined to review the defendant's claim that the trial court erred in prohibiting him from inquiring about certain Probate Court matters that he claimed were relevant to the victim's purported bias against him, the defendant having failed to raise that specific claim before the trial court and expressly abandoned it in his principal appellate brief.

Argued March 9, 2020—officially released April 27, 2021

*Procedural History*

Substitute information charging the defendant with two counts of the crime of sexual assault in the second degree, and with one count each of the crimes of sexual assault in the third degree, sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of Waterbury, where the court, *Alander, J.*, denied the defendant's objection to the composition of the venire panels; thereafter, the matter was tried to the jury before *Alander, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Trent A. LaLima*, with whom, on the brief, was *Hubert J. Santos*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Elena Pelermo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MOLL, J. The defendant, Chester J., appeals from the judgment of conviction, rendered against him following a jury trial, of one count each of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), sexual assault in the second degree in violation of § 53a-71 (a) (4), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (2), sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the trial court improperly denied his challenge to the jury panel on the grounds that (A) the panel did not reflect a fair cross section of the community in violation of the sixth amendment to the United States constitution[1] and (B) the process by which the panel was summoned violated his right to equal protection under the fourteenth amendment to the United States constitution,[2] (2) pursuant to our supervisory authority, this court should require the collection and/or maintenance of a jury panel's demographic data, and (3) the trial court erred in barring the defense from inquiring about certain Probate Court matters related to the victim's bias or motive in asserting the underlying allegations against the defendant.

While the defendant's appeal was pending, our Supreme Court issued its decision in *State* v. *Moore*, 334 Conn. 275, 278, 221 A.3d 40 (2019).[3] On the basis of that decision, this court ordered the parties to file simultaneous supplemental briefs addressing the impact of *Moore* on this appeal. After the parties submitted their supplemental briefs, this court heard oral argument. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim was born in Jamaica and, in 1995 or 1996, when she was seven or eight years old, arrived in the United States following her adoption by the defendant and his wife, H, who resided in Waterbury.[4] Shortly after the move, and for many years thereafter, the defendant sexually assaulted the victim. The incidents occurred frequently when the victim would sleep in her parents' bed during the winter months. The defendant would place his hand in her underwear and touch her clitoris.

The victim and her parents moved to another location in Waterbury in 1999. When the victim was thirteen years old, the defendant began having sexual intercourse with her, which continued until she was approximately twenty-one years of age. Throughout her high school years, the defendant forced the victim to have sexual intercourse with him approximately twice a week. In connection with the defendant's sexual advances, the defendant would threaten withholding

from the victim basic necessities, such as clothing or money for participation in school activities, if she did not cooperate. The victim's grades began to suffer during her sophomore year in high school, and she became suicidal. The defendant employed various measures to conceal his conduct from H.

Following her graduation from high school in 2007, the victim was accepted into a college in upstate New York, but the defendant refused to allow her to attend there, instead requiring that she enroll in a college closer to home. The defendant continued to have sexual intercourse with the victim until she married in 2009, and moved out of her parents' home. Shortly thereafter, the victim disclosed the abuse for the first time, initially to her mother, H, and several years later, in or about 2015, to her sister. After her disclosure to her sister, the victim eventually contacted the police.

Once the victim made an initial complaint to the police, she recorded two conversations between herself and the defendant regarding the abuse she had suffered. In the first conversation, the defendant expressed his sorrow and asked for forgiveness. In the second conversation, which took place in or about June, 2015, the defendant, after having been contacted by the police, shouted at the victim, repeatedly apologized, and expressed concern that his conduct would "shame the family" and would be "all over the news." The defendant also conveyed to the victim his desire to "get rid of this whole case" and asked her what she wanted in exchange for retracting her complaint. The victim explained that she wanted to be able to stay in the familial home and take care of H, who was suffering from dementia at the time, and she wanted the defendant out of the house. The defendant indicated he wanted H's pension. Amenable to the foregoing terms, the defendant reduced them to writing, and both he and the victim signed the document embodying the agreement. Unbeknownst to the defendant, the victim had no intention of withdrawing her complaint, and she turned over the recordings to the police.

The defendant subsequently was arrested, and the state charged him by way of a substitute information with one count each of sexual assault in the second degree in violation of § 53a-71 (a) (1), sexual assault in the second degree in violation of § 53a-71 (a) (4), sexual assault in the third degree in violation of § 53a-72a (a) (2), sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and risk of injury to a child in violation of § 53-21 (a) (2). A jury thereafter convicted the defendant of all counts and, in accordance with the verdict, the trial court imposed a total effective sentence of thirty-three years of imprisonment, execution suspended after eighteen years, followed by fifteen years of probation. This appeal followed. We will set forth additional facts and procedural history where nec-

essary.

## I

The defendant first claims that the trial court improperly denied his challenge to the jury panel on the grounds that (1) the panel did not reflect a fair cross section of the community in violation of the sixth amendment to the United States constitution, and (2) the process by which the panel was summoned violated his right to equal protection under the fourteenth amendment to the United States constitution. Specifically, the defendant contends that there was an underrepresentation of African-Americans and Hispanics in the jury array. Although "[w]e recognize the importance of fairness in our judicial system, and particularly as to our jury selection procedures"; *State* v. *Gibbs*, 254 Conn. 578, 585, 758 A.2d 327 (2000); we conclude that the defendant's constitutional rights were not violated.

The following additional facts, as set forth in the trial court's memorandum of decision or as undisputed in the record, and procedural history are relevant to our resolution of these claims. Jury selection took place over the course of three days, specifically, on November 7, 9, and 13, 2017. Six jurors, plus two alternates, were selected from three venire panels of thirty members each. On the second day of jury selection, the defendant orally objected to the composition of the venire panel. On the third day, November 13, 2017, the defendant filed a written objection to the racial and ethnic composition of the November 7 and 9 venire panels, contending that African-Americans and Hispanics were underrepresented. On November 16, 2017, the defendant filed a motion for the state and the defense to have immediate access to the jury lists and juror questionnaires, which the court granted that same day with respect to the panel assignment lists and the juror questionnaires for the three venire panels.

On November 20 and 30, 2017, the trial court held an evidentiary hearing on the defendant's objection to the venire panels. Eight witnesses testified. Among them, Attorney Philip Miller, as the duly authorized designee of then Attorney General George Jepsen, testified that, since December, 2012, the Office of the Attorney General had not initiated a civil enforcement proceeding, pursuant to General Statutes § 51-237,[5] to seek imposition of a fine against any nonappearing juror. He explained that the Judicial Branch provides a list of nonappearing jurors to the Office of the Attorney General either on a monthly or a quarterly basis. Those lists do not include, among other things, the race of the nonappearing jurors. When questioned about the lack of enforcement, Attorney Miller stated, in part, that the legislature had not provided any appropriations to accomplish that task. Attorney Miller also testified that, prior to pursuing a civil penalty against a nonappearing juror, the Office of the Attorney General would first

have to investigate the reasons for the nonappearance.

Shari DeLuca, the jury outreach coordinator for the Judicial Branch, testified that she engages in community outreach for the purpose of educating the public about jury duty and that her goal is to increase public responsiveness to jury summonses. To effectuate that goal, she has given presentations at high schools, colleges, and community events. DeLuca also has appeared on Hispanic radio stations.

Girvan Dinnall, an information technology analyst for the Judicial Branch, testified that he compiles data from the Department of Revenue Services, the Department of Motor Vehicles, voter registration rolls, and the Department of Labor to create a master list for the purpose of summoning potential jurors. The information collected from those sources includes names, addresses, dates of birth, and social security numbers, if available. A compilation process—whereby the data, through a series of mostly computerized processes, are placed into a "clean," standardized master list—yields approximately 3.15 million records (i.e., individuals). The names on the list are separated by, and then randomized for, each of the state's thirteen judicial districts, and then all towns within those districts. Individuals are randomly selected to receive juror summonses on the basis of the proportional representation of the population of the town in which they reside in relation to that of their judicial district (based on United States Census Bureau data). Dinnall repeatedly explained that a prospective juror's race has no bearing on his work and that he does not have access to that information.

Esther Harris, the jury administrator for the Judicial Branch, is responsible for summoning jurors in Connecticut. Harris testified that the process of summoning jurors is governed by statute, is race blind, and is done randomly. See General Statutes § 51-219a et seq. During Harris' testimony, the parties stipulated that African-Americans and Hispanics respond to jury summonses at a lower rate than others, particularly within cities. Harris described how, in order to address the higher nonresponse rate among African-Americans and Hispanics, her office requested, and the Department of Motor Vehicles now provides, information relating to identification card holders, and not just to licensed drivers. When questioned about the Office of the Attorney General's nonenforcement of the civil penalty for failure to appear for jury duty, Harris responded as follows, referencing a period when enforcement was within the purview of the Office of the State's Attorney: "It's been difficult because you want to make sure that any enforcement that is done is effective. It's complicated. It has been tried before, and it did not turn out the way that we expected because what ended up happening, and this is years ago . . . there was a fine attached to it, and individuals felt as if, well, there is a fine, how

much is it, I'll pay the fine rather than show. So, individuals looked at it as an alternative . . . . [T]hey were looking at it as, well, I would rather pay the fine than show up.''

Finally, the defendant presented the testimony of Camille Seaberry, a research associate at Data Haven, who was called as an expert witness to opine, as a starting point, on the probable race of those individuals in the ninety person venire who did not provide their racial information on their individual questionnaires. Fifty-nine venirepersons filled out their racial information in their questionnaires, which Seaberry treated as definitive with respect to the venireperson's race. With respect to the remaining venirepersons, who did not fill out such information, Seaberry used a Bayesian probability model based on surnames, addresses, and census data to predict their race. Out of the ninety venirepersons, she calculated that seventy-five were white, five were African-American, eight were Hispanic, and two were deemed ''other,'' likely those of Asian descent. Seaberry drew the following conclusions with respect to the judicial district of Waterbury: (1) Caucasians made up 71.5 percent of its citizens, 68.9 percent of its population of adults aged eighteen to seventy-four, and 83.3 percent of the venire panel, (2) African-Americans made up 10.4 percent of its citizens, 11 percent of its population of adults aged eighteen to seventy-four, and 5.6 percent of the venire panel, and (3) Hispanics made up 15.5 percent of its citizens, 16.8 percent of its population of adults aged eighteen to seventy-four, and 8.9 percent of the venire panel. On the basis of the foregoing percentages, Seaberry calculated an absolute disparity, a comparative disparity, and a standard deviation for the relevant population of adults aged eighteen to seventy-four as follows: (1) with respect to African-Americans, 0.054, 0.494, and 1.644, respectively, and (2) with respect to Hispanics, 0.079, 0.471, and 2.008, respectively.[6] Seaberry explained that two standard deviations is ''a pretty standard benchmark to use,'' meaning if ''something . . . falls outside of this range . . . that makes us think that it's not totally random.'' She opined that the standard deviation for Hispanic adults was ''just over that two standard deviations threshold,'' meaning outside the range that one would expect if the deviation were caused by random chance. According to Seaberry's findings, the standard deviation for Hispanics dropped below two standard deviations when comparing the venire panel to adult *citizens* in the relevant population.

Following the presentation of evidence, defense counsel addressed the court. In support of the defendant's objection to the venire panel on fair cross section grounds, defense counsel argued that the state had failed to engage in substantive changes to remedy the underrepresentation of minorities and overrepresentation of Caucasians in the jury pool. With regard to his

equal protection claim, defense counsel argued that the state had demonstrated a wilful "institutional blindness" by failing to adopt measures to increase minority participation in jury pools. The state countered that the defendant failed to prove that it systematically had excluded jurors and, rather, the evidence demonstrated that it had engaged in methods to increase minority participation. In addition, the state explained that any underrepresentation of minorities and any lack of responsiveness to jury summonses were not attributable to the jury summoning system because the system is not responsible for the personal conduct of summoned individuals who fail to appear for jury duty.

In its memorandum of decision dated December 15, 2017, the trial court denied the defendant's challenge to the venire panels. First addressing the fair cross section claim, the court, applying the three part test set forth in *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), concluded that the defendant had failed to establish a prima facie violation of the sixth amendment's fair cross section requirement because the evidence did not demonstrate that the purported underrepresentation of African-Americans and Hispanics resulted from their systematic exclusion in the jury selection process (i.e., the third prong of the *Duren* test).[7] The court observed that "[t]he only aspects of the jury selection process which the defendant points to as flaws leading to the underrepresentation of African-Americans and Hispanics are the state's failure to take any action against nonappearing individuals duly summoned for jury duty and its failure to conduct outreach efforts targeted at minority residents." Although the defendant presented evidence that (1) the Office of the Attorney General has not pursued civil enforcement against nonappearing jurors in the recent past, and (2) the Judicial Branch does not specifically focus its juror outreach efforts on the responsiveness of minorities to jury summonses, "the defendant did not present . . . any evidence that such enforcement or focused outreach efforts would lead to a material increase in the number of African-Americans and Hispanics appearing for jury service." In other words, the defendant's argument assumed, without evidence, that had the state engaged in the suggested activities, minority juror participation would increase. The court found, on the basis of the record before it, that "that assumption [was] unwarranted and unproven."

Turning to the equal protection claim, the court applied the three part test set forth in *State* v. *Gibbs*, supra, 254 Conn. 578, which requires, as proof of an equal protection violation in jury selection "(1) underrepresentation of a recognizable group; (2) substantial underrepresentation over a significant period of time; and (3) a selection procedure susceptible to abuse or not racially neutral." (Internal quotation marks omitted.) Id., 594, citing *Castaneda* v. *Partida*, 430 U.S. 482,

494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). The court concluded that the defendant's claim failed because, as in *Gibbs*, the defendant had not demonstrated that the jury selection process was susceptible to abuse or was racially biased. The court explained that "the defendant . . . failed to establish that the greater propensity of African-Americans and Hispanics to fail to respond to jury summons was due to anything other than external factors, such as poverty, residential mobility, linguistic isolation, or distrust of the legal system. The defendant certainly has not met his burden of showing that the failure to bring any legal action seeking the imposition of civil fines or to initiate focused outreach efforts is subject to abuse or not racially neutral." Therefore, the defendant's claim faltered on the third prong of the equal protection test, i.e., a selection procedure that is susceptible to abuse or that is not racially neutral.

In addition, the court determined that the defendant had failed to meet his burden with respect to the second prong of the equal protection test, requiring a showing of "substantial underrepresentation over a significant period of time." The court found that, at best, the defendant had shown an underrepresentation in the selection process for one trial. The court further noted that, although Seaberry's analysis resulted in a standard deviation for Hispanics aged eighteen to seventy-four of 2.008, once it accounted for those *eligible* for jury service, i.e., native born and naturalized citizens (as only United States citizens presently can serve as jurors in Connecticut), the standard deviation dropped to 1.7394, "a number which the defendant admits is insufficient to establish a lack of randomness." On the basis of the foregoing, the court denied the defendant's challenge to the jury array.

Before addressing the merits of the defendant's constitutional and supervisory authority claims, we provide an overview of *State* v. *Moore*, 169 Conn. App. 470, 151 A.3d 412 (2016), appeal dismissed, 334 Conn. 275, 221 A.3d 40 (2019), which largely guides our resolution of those claims. In *Moore*, the defendant, convicted of murder, claimed that the trial court erred in denying his motion to strike the venire panel in violation of (1) his sixth amendment right to a panel drawn from a fair cross section of the community and (2) his fourteenth amendment right to equal protection. Id., 474–75. He also requested that this court exercise its supervisory authority " 'to mandate that the jury administrator collect demographic data so that it is able to follow the statutory directive to prevent [discrimination] in jury selection.' " Id., 475. During jury selection, the defendant filed an objection to the composition of the venire panel on the basis of defense counsel's observation that of the approximately 100 venirepersons, there were 2 African-American women, and, to his belief, 1 African-American man (even though that individual self-identified on his jury questionnaire as Hispanic and Latin

American). Id., 476. At the evidentiary hearing on the defendant's objection, defense counsel orally amended his objection to move to strike the venire panel. Id., 477. The defense presented the testimony of six witnesses, including the information technology manager for jury administration, the jury administrator for the Judicial Branch, and the jury clerk for the judicial district of New London. Id., 477–80. Following the hearing, defense counsel argued that the lack of diversity in the jury pools, and the absence of African-American men, established a fair cross section violation under the sixth amendment and an equal protection violation under the fourteenth amendment. Id., 480. Relying on census data, defense counsel also argued that African-Americans were underrepresented in the jury pool in light of state-wide and New London county demographics. Id.

The trial court denied the defendant's motion to strike the venire panel, finding that there was no systematic exclusion of jurors on the basis of race. Id., 481. With respect to the defendant's fair cross section claim, the court concluded that there was "insufficient evidence of the racial makeup of the jury pool or any statistical support for the claim that [African-Americans were] underrepresented in the pool." (Internal quotation marks omitted.) Id., 483. The court similarly rejected the defendant's equal protection claim, ruling that the defendant had failed to demonstrate discriminatory intent on the part of Connecticut's jury selection system. Id., 483–84.

On appeal, this court affirmed the judgment, first concluding with respect to the fair cross section claim that "[t]he defendant failed to present evidence to demonstrate that the representation of African-American males in venires from which juries are selected was not fair and reasonable in relation to the number of such persons eligible to serve as jurors in the community." Id., 485. This court explained that the census data on which the defendant relied was not probative evidence because it reflected the percentage of all African-Americans in Connecticut and New London county, rather than the percentage of African-American males eligible for jury service. Id. Addressing the equal protection claim, this court concluded that there was no evidence that potential jurors systematically were excluded from jury service. Id., 486. Additionally, "[t]he undisputed evidence presented by the defendant reflected that Judicial Branch officials were unaware of the racial and ethnic characteristics of persons summoned for jury duty and that, to the extent that prospective jurors voluntarily provided information related to their race or ethnicity on their confidential juror questionnaire, such information was not retained or recorded." Id.

Finally, the defendant also argued on appeal in *Moore* that this court should, pursuant to its supervisory

authority over the administration of justice, " 'enforce the collection of demographic data to permit analysis of the diversity of jury panels in Connecticut.' "[8] Id., 487. This court declined that request, reasoning: "As a preliminary matter, the defendant's request is supported by an unproven premise, namely, that the jury panels at issue in the present case reflected significant underrepresentation of a recognized group or were not representative of a fair cross section of the community. Moreover, it is difficult to discern how the relief sought by the defendant—the collection of information related to the race and ethnicity of *all* prospective jurors—would comport with the plain language of [General Statutes] § 51-232 (c), which expressly states that prospective jurors need not provide such information." (Emphasis in original.) Id., 488.

Our Supreme Court granted certification to appeal,[9] ultimately dismissing the appeal on the ground that certification was improvidently granted. See *State* v. *Moore*, supra, 334 Conn. 278. With respect to the defendant's supervisory authority claim regarding the collection of racial and demographic data of potential jurors, the court stated the following: "[T]he fact that the legislature has acted in this area by enacting § 51-232 (c)—which specifically makes the provision of racial and ethnic data optional for the juror—renders us reluctant to exercise our supervisory authority in the sweeping manner sought by the defendant . . . ." Id., 279.

Against this backdrop, we now consider the defendant's constitutional claims.

A

We begin with the defendant's fair cross section claim pursuant to the sixth amendment to the United States constitution.[10] "Fair cross section claims are governed by a well established set of constitutional principles. In order to establish a violation of his federal constitutional right to a jury drawn from a fair cross section of the community, the defendant must demonstrate the following: (1) that the group alleged to be excluded is a distinctive group in the community;[11] (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the [jury selection] process. *Duren* v. *Missouri*, [supra, 439 U.S. 364] . . . ." (Footnote added; internal quotation marks omitted.) *State* v. *Gibbs*, supra, 254 Conn. 588. "[I]n a fair cross section claim, the defendant need not prove intent. [S]ystematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (Internal quotation marks omitted.) Id. "[W]e review the [trial] court's factual determinations

relevant to the defendant's [s]ixth [a]mendment . . . challenge for clear error . . . but we review de novo the court's legal determination whether a prima facie violation of the fair cross section requirement has occurred." (Internal quotation marks omitted.) *State* v. *Moore*, supra, 169 Conn. App. 484.

In support of his claim that the trial court improperly found that he had failed to demonstrate systematic exclusion of African-Americans and Hispanics in the jury selection process (i.e., the third prong of the *Duren* test), the defendant makes two contentions: (1) the state was aware that these minority groups were appearing for jury duty at a lower rate than other groups; and (2) the Office of the Attorney General has failed to enforce the civil penalty prescribed by § 51-237 against nonappearing jurors, the enforcement of which would have led to an increase in responsiveness. These arguments are unavailing.

First, there exists no basis to equate the state's general awareness of a lower response rate to jury summonses among certain minority groups with a finding that it has systematically excluded those groups in the jury selection process. As the United States Court of Appeals for the Second Circuit has explained, "the existence of systematic underrepresentation turns on the process of selecting venires, not the outcome of that process in a particular case." *United States* v. *Jackman*, 46 F.3d 1240, 1248 (2d Cir. 1995). With regard to the *process* by which the Judicial Branch's jury administration summons potential jurors, the uncontroverted evidence established that it is accomplished without regard to race.

Second, as the trial court correctly explained, with respect to the Attorney General's nonenforcement of civil penalties on nonappearing jurors pursuant to § 51-237, there was no evidence to support a finding that such enforcement would lead to greater responsiveness to juror summonses. See *State* v. *Moore*, supra, 169 Conn. App. 481–85 (noting "correctness" of trial court's legal analysis of defendant's fair cross section claim, whereby court rejected claim because, among other things, there was no evidence that " 'representation of jurors from a distinctive group would be affected by enforcement action' "). Moreover, it is difficult to perceive how enforcement of civil penalties against nonappearing jurors would even be probative, for constitutional purposes, with respect to whether the state had systematically *excluded* individuals in the jury selection process. That is, any nonappearing juror was necessarily *included* in the juror summoning process but did not appear for any number of reasons external to the process by which he or she was summoned. See *State* v. *Gibbs*, supra, 254 Conn. 596–97.

In sum, we conclude that the defendant did not establish a prima facie violation of the sixth amendment's

fair cross section requirement because he failed to demonstrate that any underrepresentation of African-Americans and Hispanics resulted from their systematic exclusion in the jury selection process.[12]

## B

We now turn to the defendant's claim that the jury summoning process violated his fourteenth amendment right to equal protection. The defendant largely relies on the arguments made with respect to his sixth amendment claim. For the reasons that follow, this claim is similarly unavailing.

"An equal protection violation in jury selection procedures may be established by proof of (1) underrepresentation of a recognizable group; (2) substantial underrepresentation over a significant period of time; and (3) a selection procedure susceptible to abuse or not racially neutral. . . . Although the equal protection test is similar to the cross section test, the critical difference is that in an equal protection claim the defendant must prove discriminatory purpose." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Moore*, supra, 169 Conn. App. 486; see also *State* v. *Castonguay*, 194 Conn. 416, 421, 481 A.2d 56 (1984) (discriminatory intent required to prove equal protection violation).

By way of review, the trial court concluded that the defendant failed to establish an equal protection violation, finding a failure of proof as to each of the prongs of the equal protection test. We need focus our analysis only on the third prong.[13] Specifically, the trial court found, and we agree, that the defendant failed to demonstrate that Connecticut's jury selection procedure is susceptible to abuse or is not racially neutral. As our Supreme Court explained in *Gibbs*, the third prong is satisfied when "a defendant [demonstrates] that the jury selection process is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable . . . or that the [s]tate [has] . . . deliberately and systematically [denied] to members of [a] race the right to participate as jurors in the administration of justice." (Citation omitted; internal quotation marks omitted.) *State* v. *Gibbs*, supra, 254 Conn. 596. As set forth in part I A of this opinion, the defendant has not established that the state systematically excluded African-Americans and/or Hispanics from the jury selection process. Furthermore, the defendant did not provide the court with any evidence of discriminatory intent with respect to excluding African-Americans or Hispanics. Here, as we found in *Moore*, "[t]he undisputed evidence presented by the defendant reflected that Judicial Branch officials were unaware of the racial and ethnic characteristics of persons summoned for jury duty and that, to the extent that prospective jurors voluntarily provided information related to their race or ethnicity

on their confidential juror questionnaire, such information was not retained or recorded." *State* v. *Moore*, supra, 169 Conn. App. 486. As in *Gibbs*, the defendant has failed to establish how the higher rate of nonreporting in response to jury summonses among African-Americans and Hispanics is attributable to the state, rather than to *external* factors beyond the state's control. See *State* v. *Gibbs*, supra, 596–97 ("[a]s the trial court found, there is a greater occurrence of undeliverable jury summonses and failures to report for jury service in the Hispanic community than in the general population, not as a result of racial discrimination, but in the main because of residential mobility and linguistic isolation").

Mindful of the marked similarity between the unsuccessful equal protection claims made in *Gibbs* and *Moore* and the claim asserted in the present case, we conclude that the court properly determined that the defendant failed to establish an equal protection violation because, at a minimum, there was no evidence of a jury selection procedure that is susceptible to abuse or that is not racially neutral.

## II

The defendant next invites this court to exercise its supervisory authority over the administration of justice to require the collection and/or maintenance of venire panel demographic data in order to allow for analysis of underrepresentation claims. We decline the invitation.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Indeed, there is no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum because articulating a rule of policy and reversing a conviction under our supervisory powers is perfectly in line with the general principle that this court ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn.

726, 764–65, 91 A.3d 862 (2014).

Section 51-232 (c) provides in relevant part: "The Jury Administrator shall send to a prospective juror a juror confirmation form and a confidential juror questionnaire. Such questionnaire shall include questions eliciting the juror's name, age, race and ethnicity, occupation, education and information usually raised in voir dire examination. *The questionnaire shall inform the prospective juror that information concerning race and ethnicity is required solely to enforce nondiscrimination in jury selection, that the furnishing of such information is not a prerequisite to being qualified for jury service and that such information need not be furnished* if the prospective juror finds it objectionable to do so. . . ." (Emphasis added.)

At bottom, the defendant asks us to make mandatory what the legislature, in enacting § 51-232 (c), has made discretionary—the provision of information concerning race and ethnicity from a prospective juror in a confidential juror questionnaire. Beyond dismissing the appeal in *Moore*, in addressing a similar request, our Supreme Court voiced its reluctance, then its refusal, "to exercise [its] supervisory authority in the sweeping manner sought by the defendant . . . ." *State* v. *Moore*, supra, 334 Conn. 279. Here, the defendant asserts in his supplemental appellate brief, without citation to any authority, that "the Supreme Court's reluctance does not bar this [c]ourt's use of [supervisory] authority." We defer to the consideration of these issues by our Supreme Court's Jury Selection Task Force. See *State* v. *Holmes*, 334 Conn. 202, 250–52, 221 A.3d 407 (2019) (establishing Jury Selection Task Force to be appointed by Chief Justice); *State* v. *Moore*, supra, 334 Conn. 279 ("we anticipate these issues will be considered by the Jury Selection Task Force . . . to suggest those changes to court policies, rules, and legislation necessary to ensure that our state court juries are representative of Connecticut's diverse population" (citation omitted)).[14]

Furthermore, in *Moore*, this court expressed concern with exercising its supervisory authority in a manner that would effectively rewrite the language of § 51-232 (c). *State* v. *Moore*, supra, 169 Conn. App. 488. Our Supreme Court voiced a similar concern in its opinion. *State* v. *Moore*, supra, 334 Conn. 279. In an attempt to alleviate the separation of powers concerns underlying the rationale for declining to invoke our supervisory power in *Moore*, the defendant asserts that we could direct the state to "maintain the data regarding prospective jurors who do fill out the questionnaire." As this court recognized in *Moore*, however, "the resulting data, reflecting information concerning some but not all prospective jurors, would not provide an accurate basis on which to assess the racial and ethnic characteristics of prospective jurors as a whole." *State* v. *Moore*, supra,

169 Conn. App. 489 n.6.

In light of the foregoing, we decline to exercise our supervisory authority and craft the extraordinary remedy requested by the defendant.

### III

The defendant's final claim is that the trial court erred in prohibiting him from inquiring about certain Probate Court matters that he claimed to be relevant to the victim's purported bias against him. The state contends, as an initial matter, that because the defendant raises a different claim on appeal than he did at trial, the claim is unreviewable. We agree with the state.

The scope of our appellate review of evidentiary issues on appeal is limited to those issues that were pursued at trial. "Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 761, 155 A.3d 188 (2017).

The following additional background is relevant to our resolution of this claim. On December 6, 2017, during the defendant's case-in-chief, the defendant sought to call as a witness Attorney Bryan McEntee, who had been appointed by the Probate Court to represent H. On the state's request for an offer of proof as to Attorney McEntee's testimony, the defendant proffered three purposes, the second of which is in dispute on appeal.

First, the defendant sought to enter into evidence, through Attorney McEntee, a copy of H's passport to show that H was in Jamaica during a particular period of time. The state had no objection.

Second, the defendant sought to offer Attorney McEntee's "position about whether [the victim] should . . . be appointed . . . conservator of [H's] estate." When the court questioned the relevance of such evidence, the defendant responded that Attorney McEntee's "concern about [the victim's] misuse of funds" went to her "truthfulness and trustworthiness," which, according to the defendant, supported his defense that the victim had fabricated the allegations against him in order to acquire H's money and the familial home. The court excluded Attorney McEntee's "opinion as to whether [the victim] was misusing funds" as irrelevant and, thus, inadmissible. Notwithstanding the defendant's statement in his principal appellate brief that he "is not pursuing the claim that . . . Attorney McEntee's opinions regarding [the victim] should have been admitted," this second category of evidence remains the subject of the defendant's evidentiary claim on appeal.

Third, the defendant sought to introduce a bank

record indicating that the victim had already paid for H's nursing home care in Jamaica before the victim went to Jamaica. According to the defendant, this evidence would demonstrate that the victim lied under oath before the Probate Court when she testified there that her decision with respect to H's care was not made until after she visited Jamaica and consulted with her family. The court sustained the state's objection on relevance grounds. On appeal, the defendant has expressly abandoned any challenge to the exclusion of this evidence.

On appeal, the defendant claims that the court "wrongly sustained the objection to all evidence regarding the probate matter, wrongly deeming it 'collateral.' "[15] The defendant contends that the court "should have admitted evidence which pertained to the [victim's] bias or motive to lie about [the defendant]." The defendant further argues that "Attorney McEntee's recollection of 'what happened' at the probate proceeding (the [victim's] efforts to seek [H's] property), would be fact evidence rather than his opinion."

As our careful review of the trial transcript reveals, the fundamental flaw with the defendant's evidentiary claim is that his proffer before the trial court, with respect to the second category of evidence, went no further than to seek Attorney McEntee's "*position* about whether or not [the victim] should also be appointed . . . conservator of the estate," and "his *concern* about [the victim's] misuse of funds."[16] (Emphasis added.) As stated previously in this opinion, the defendant expressly abandoned in his principal appellate brief "the claim that . . . Attorney McEntee's opinions regarding [the victim] should have been admitted." Accordingly, we conclude that the defendant's present claim, which attempts to cast a wider net than the proffer before the trial court, was not raised before the trial court and, therefore, we decline to review it. See *State* v. *Fernando V.*, 331 Conn. 201, 211–13, 202 A.3d 350 (2019).

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The sixth amendment's fair cross section requirement is enforceable against the states under the due process clause of the fourteenth amendment to the United States constitution. See *State* v. *McCarthy*, 197 Conn. 247, 249 n.1, 496 A.2d 513 (1985).

[2] We address the defendant's constitutional claims together. See parts I A and B of this opinion.

[3] On November 15, 2019, this court granted the defendant's motion to stay this appeal pending our Supreme Court's disposition of *Moore*.

[4] We refer to the defendant and H as the victim's parents in this opinion.

[5] General Statutes § 51-237 provides: "Each juror, duly chosen, drawn and summoned, who fails to appear shall be subject to a civil penalty, the amount

of which shall be established by the judges of the Superior Court, but the court may excuse such juror from the payment thereof. If a sufficient number of the jurors summoned do not appear, or if for any cause there is not a sufficient number of jurors to make up the panel, the court may order such number of persons who qualify for jury service under section 51-217 to be summoned as may be necessary, as talesmen, and any talesman so summoned who makes default of appearance without sufficient cause shall be subject to a civil penalty, the amount of which shall be established by the judges of the Superior Court. The provisions of this section shall be enforced by the Attorney General within available appropriations."

[6] In *State* v. *Gibbs*, supra, 254 Conn. 578, our Supreme Court described these measures. Absolute disparity "measures the difference between the percentage of the cognizable class in the population and the percentage of that group represented in the venire." (Internal quotation marks omitted.) Id., 589 n.12. Comparative disparity "subtract[s] the percentage of the cognizable group in the challenged jury pool from the percentage of the cognizable group in the relevant population, and then divid[es] that amount by the percentage of the cognizable group in the relevant population." Id., 589 n.13. Standard deviation is "the range within which the percentage of persons from the recognizable group selected for the jury array could vary and still be the product of random chance, with the likelihood of random chance being the source of the deviation decreasing as the number of standard deviations increases. From that standard deviation one may then calculate the chance that an actual disparate percentage occurred randomly." Id., 595 n.19.

[7] "In order to establish a prima facie violation of the [fair cross section] requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the [jury selection] process." *Duren* v. *Missouri*, supra, 439 U.S. 364.

Although the court concluded that the defendant's claim failed to satisfy the third prong of the *Duren* test, it briefly addressed the evidence elicited through Seaberry insofar as it was presented to satisfy the second prong thereof. The court stated that "[t]he established law in Connecticut rejects each of these three measures [absolute disparity, comparative disparity, and standard deviation] as an appropriate basis for determining underrepresentation with respect to a sixth amendment claim. See *State* v. *Castonguay*, 194 Conn. 416, 427–30, [481 A.2d 56] (1984); *State* v. *Gibbs*, supra, [254 Conn.] 590–91. 'Ultimately . . . the decision is not one of numbers but rather a subjective determination of whether the disparity is constitutionally significant.' *State* v. *Castonguay*, supra, 427." In light of its holding with respect to the third prong, the court declined to address further the second prong of *Duren* because the *Duren* requirements are stated in the conjunctive.

[8] The defendant also claimed on appeal that the trial court erred in denying his motion to suppress identification evidence, with which this court disagreed. See *State* v. *Moore*, supra, 169 Conn. App. 489.

[9] Specifically, our Supreme Court granted certification, limited to the following issues: "In concluding that the defendant could not prevail on his motion to strike the voir dire panel on the ground that it failed to constitute a fair cross section of the community:

"1. Did the Appellate Court properly conclude that census data pertaining to the entire African-American population in Connecticut and New London county was not probative evidence with respect to the claimed underrepresentation of African-American males in the jury pool?

"2. Did the Appellate Court properly decline, in light of the provisions of . . . § 51-232 (c), to exercise its supervisory authority over the administration of justice to enforce the collection of demographic data to permit analysis of the diversity of jury panels in Connecticut?" (Internal quotation marks omitted.) *State* v. *Moore*, 324 Conn. 915, 915–16, 153 A.3d 1289 (2017).

[10] Although the defendant states in his principal appellate brief that his "claim regarding the jury panel is one of both state and federal constitutional magnitude," he has not provided an independent analysis of any state constitutional claim in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Accordingly, we deem abandoned any such claim. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 748 n.1, 155 A.3d 188 (2017).

[11] The parties agree that the defendant satisfied this first prong because African-Americans and Hispanics "clearly comprise . . . distinctive group[s]." *State* v. *Gibbs*, supra, 254 Conn. 588.

[12] Although we need not address the second prong of the defendant's fair cross section claim, we make the following observation. Through Seaberry, the defendant offered the following three statistical models to demonstrate underrepresentation of African-Americans and Hispanics: (1) absolute disparity; (2) comparative disparity; and (3) statistical decision theory. In *Gibbs*, our Supreme Court rejected each of these models, requiring instead that a defendant utilize the substantial impact test in establishing a fair cross section violation. *State* v. *Gibbs*, supra, 254 Conn. 589–91 (explaining differences among those statistical models and reasons for rejecting them). The defendant did not utilize the substantial impact test in the present case.

[13] Because the test for an equal protection violation in jury selection procedures is stated in the conjunctive, we need not address either of the other two prongs, as a failure of proof on any of the prongs defeats the claim.

[14] The charge of the task force, whose work has been completed, was "[t]o propose meaningful changes to be implemented via court rule or legislation, including, but not limited to (1) proposing any necessary changes to . . . [§] 51-232 (c) which governs the confirmation form and questionnaire provided to prospective jurors, (2) improving the process by which we summon prospective jurors in order to ensure that venires are drawn from a fair cross section of the community that is representative of its diversity, (3) drafting model jury instructions about implicit bias, and (4) promulgating new substantive standards that would eliminate *Batson*'s requirement of purposeful discrimination." Connecticut Judicial Branch Jury Selection Task Force Charge, available at https://jud.ct.gov/Committees/jury taskforce/default.htm (last visited April 15, 2021).

On December 31, 2020, the task force issued its final report, containing recommendations for systemic jury reform in Connecticut. See Jury Selection Task Force, Report of the Jury Selection Task Force to Chief Justice Richard A. Robinson (December 31, 2020), available at https://jud.ct.gov/Committees/jury taskforce/ReportJurySelectionTaskForce.pdf (last visited April 15, 2021).

[15] We note that, in making this assertion, the defendant cites to the portion of the transcript in which the court was ruling on the *third* category of proposed evidence.

[16] The record also makes clear that, by its own comments, the court understood the defendant's proffer in this regard to be limited to Attorney McEntee's "opinion" as to whether the victim was misusing funds.

---